UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON CENTERLESS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 1:22-cv-11729 |
| v. | ) |
| | ) |
| MARK A. DESANTIS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Boston Centerless, Inc. ("Plaintiff" or "Boston Centerless") moves for a preliminary injunction to enjoin Defendant Mark A. DeSantis ("DeSantis"), a former employee of Boston Centerless, from further misappropriating or disclosing Boston Centerless's trade secrets. On his last day at Boston Centerless, DeSantis used his company email account to send thirteen (13) separate emails with Boston Centerless's confidential and proprietary information and trade secrets to his personal email addresses/accounts. When Boston Centerless subsequently demanded that he return or destroy these materials, DeSantis flatly refused, and threatened to misuse and disclose the information for the benefit of Boston Centerless's competitors. Boston Centerless's Verified Complaint ("Compl.") and this motion for preliminary injunction follow.

I.      **FACTUAL BACKGROUND**

The following facts are set forth in Boston Centerless's Verified Complaint, as well as the Declaration of Laurent Cros ("Cros Dec."). Founded in 1958, Boston Centerless is a Woburn-based manufacturer and distributor of precision raw materials and preparation services. Compl. ¶ 6; Cros Dec. ¶¶ 5-8. Boston Centerless supplies ultra-precise ground bar materials, and provides high precision centerless grinding services, to end-use product manufacturers in the medical,

dental, aerospace, automotive, and defense industries for use in the manufacture of their products. *Id*.

In August 2021, DeSantis accepted a job as a regional sales manager at Boston Centerless, serving the company's Midwest customers. Compl. ¶ 20; Cros Dec. ¶ 11. In that role, DeSantis was responsible for various business development activities including client development, customer relations, and sales. Compl. ¶ 20; Cros Dec. ¶ 14. Because his position involved access to confidential, proprietary, and competitively sensitive information such as customer information (including customer lists, customer needs, preferences, and order histories), price lists, quotes, profit margins, sales forecasts, sales and marketing information, and strategic plans, DeSantis entered into a Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Agreement") with Boston Centerless at the start of his employment. Compl. ¶ 20, Ex. A.

In the Agreement, DeSantis expressly recognized that he would have access to Boston Centerless's trade secrets and other proprietary and confidential information, including information regarding Boston Centerless's "customers and prospective customers (including but not limited to their needs, preferences, requirements, likes and dislikes), costs, pricing, profitability, sales and marketing strategies, pricing policies," and other information. *Id*. at 1-2. DeSantis agreed not to disclose any of this confidential information except as required in the performance of his employment at Boston Centerless or as authorized in writing by the president of Boston Centerless. *Id*. DeSantis further agreed that upon termination of his employment for any reason, he would return to Boston Centerless immediately and without demand all items which contain or constitute confidential information, and that such information remained the property of Boston Centerless. *Id*. at 2.

2

During his employment as a regional sales manager at Boston Centerless, DeSantis had regular access to Boston Centerless's confidential and proprietary information and trade secrets, including daily customer quote reports, customer order reports, customer sales reports, and inventory reports attaching voluminous spreadsheets containing sales histories for Boston Centerless customers, potential and projected sales to Boston Centerless customers based on the work Boston Centerless performed for them in the past, quantities and timing of customer orders, technical specifications for customer products ordered, cost of raw materials/inventory, quotes, and pricing of products and services ordered by Boston Centerless customers. Compl. ¶¶ 22, 31; Cros Dec. ¶¶ 19-20. DeSantis only had access to this information because, as a regional sales manager, he needed it to do his job. *Id.* at ¶ 21. Indeed, Desantis was one of only about 15 individuals at Boston Centerless, including executives and sales managers, who received reports containing this confidential and proprietary information. Compl. ¶ 32; Cros Dec. ¶ 22.

At a meeting on the morning of September 8, 2022, Boston Centerless informed DeSantis it would be terminating his employment. Compl. ¶ 33; Cros Dec. ¶ 23. Immediately following the meeting, DeSantis, from his mobile phone, surreptitiously forwarded no fewer than thirteen (13) Boston Centerless emails from his company email account to two (2) different personal yahoo.com email accounts. Compl. ¶¶ 34-35; Cros Dec. ¶¶ 24-25.

The 13 emails that DeSantis forwarded to himself attached Boston Centerless customer sales reports containing the company's confidential and proprietary information and trade secrets. Compl. ¶ 35; Cros Dec. ¶ 25. These reports included, among others, "Daily Open Orders Report[s]," "Daily Sales by Part Desc[ription] Report[s]," "Daily Quote Report YTD thru -0907," "Warehouse Inventory Status," and "Daily BC Customer Sales" reports. *Id.*; *see also* Compl. Ex.

D (copies of cover emails showing attachments).[1] These voluminous spreadsheets included the following:

- Customer lists including compilations of customer identities, customer order histories, preferences, particular needs, and pricing /terms of service offered to such customers;

- Detailed product pricing and margin information for key Boston Centerless customers, including cost of product inventory and pricing offered to customers;

- Identification of products ordered by Boston Centerless customers, including order timing and quantities;

- Information about historical sales to Boston Centerless customers in past years, the present year, and projected future sales to such customers reflecting anticipated customer needs and sales volume;

- Customer ranking by sales volume and sales potential;

- The needs and preferences of Boston Centerless's customers, including technical data and specifications for particular products ordered by such customers (including material type, part description, size, and quantity); and

- Price quotes reflecting confidential pricing to be offered and/or recently offered for potential customer orders.

Compl. ¶ 35; Cros Dec. ¶ 25. This information is confidential and not generally known or ascertainable through proper means by Boston Centerless's competitors. Compl. ¶ 36; Cros Dec. ¶ 26. Rather, Boston Centerless acquired and compiled this information through years of

---

[1] The Excel spreadsheets attached to the emails are omitted because they contain Plaintiff's trade secrets which cannot be disclosed on the public docket. If the Court requires it, Plaintiff can bring copies to any hearing on this motion (for *in camera* review), or file them under seal.

cultivating relationships and doing business with its customers and materials suppliers. *Id*. This information would be expensive and time-consuming for another person or company to properly acquire, as it would take deep familiarity and relationships with Boston Centerless's customers to re-create. Compl. ¶ 37; Cros Dec. ¶ 27.

Boston Centerless derives significant economic value from this information not being generally known or ascertainable through proper means by other companies competing for the business of manufacturers who require precision ground bar materials and grinding services, and whose identities, needs, preferences, and sales potential are not generally known. Compl. ¶ 38; Cros Dec. ¶ 28. Knowledge of this information could enable a competitor to identify sales prospects, beat Boston Centerless's pricing, and divert business from Boston Centerless. Compl. ¶ 39; Cros Dec. ¶ 29. Moreover, this information could provide competitors with an unfair, unearned advantage by enabling effective allocation of resources and marketing efforts to the listed customers based on the details about their specific needs and preferences which Boston Centerless compiled in the above-described files. Furthermore, this information could enable a competitor to prioritize or target its marketing to certain of these customers based on the detailed historical and projected future sales information Boston Centerless compiled in these files, including customer ranking by sales volume. Compl. ¶ 39; Cros Dec. ¶¶ 30-31.

Boston Centerless spent significant resources over several years to develop this information, including by employing business development personnel who track and compile information concerning customer purchase and service histories, customer needs and preferences, technical data and specifications for parts ordered and/or needed, sales volume, pricing offered to customers, sales strategies, among other such information; and by providing such employees with considerable resources necessary to develop the customer relationships that enable them to obtain

the information and know-how that provides a competitive advantage in obtaining customer business. Compl. ¶ 40; Cros Dec. ¶ 32.

Boston Centerless takes reasonable measures to protect the secrecy of this information, including limiting access to such confidential information to only those employees who need to use it to perform their jobs. Additionally, Boston Centerless informs its employees, including DeSantis, of the confidential nature of this information through its employment policies, employment training, employment contracts and other verbal and written methods. *See* Compl., Exhibits A-C; *see also* Compl. ¶ 43; Cros Dec. ¶¶ 34-37. Boston Centerless requires its employees with access to this information, including DeSantis, to sign confidentiality agreements and/or acknowledgments of their receipt and agreement to abide by the confidentiality policies set forth in the Handbook. *Id*. It also requires its employees to return all confidential information in their possession to Boston Centerless on or before their last day of employment with the company. *Id*.

A few days after DeSantis was terminated, he called one of Boston Centerless's regional sales managers and stated that (i) he had sent his resumé to two direct competitors of Boston Centerless, Banner Industries and Round Ground Metals; (ii) he had "information he is ready to share" if Boston Centerless does not pay him money; and (iii) he intended to call Boston Centerless customers to disparage Boston Centerless. Compl. ¶ 45; Cros Dec. ¶ 38.

Boston Centerless promptly retained counsel and, by letter to DeSantis dated September 19, 2022, demanded that DeSantis immediately cease and desist all unlawful misappropriation of Boston Centerless's trade secrets and breaches of the Agreement. Compl. ¶ 46; Cros Dec. ¶ 39. Boston Centerless further demanded that DeSantis agree to permit third-party examination of his computer, mobile, and data storage devices and email accounts to confirm permanent deletion of any electronic files or data containing the company's confidential information or trade secrets.

Compl. ¶ 46; Cros Dec. ¶¶ 40. Boston Centerless also requested that DeSantis verify in writing and under penalty of perjury that he has permanently deleted, and not retained copies of, all such information in his possession or control and that he has not and will not disclose it to, or misuse it for the benefit of, any other person or entity. Compl. ¶ 46; Cros Dec. ¶ 41.

DeSantis responded on September 28, 2022 denying that he took any Boston Centerless confidential information, and refusing to address the company's request that he permit a third-party vendor to inspect and confirm deletion of the company's files from his personal devices and email accounts. Compl. ¶ 47; Cros Dec. ¶ 42. On September 29, 2022, counsel for Boston Centerless contacted DeSantis, twice, requesting a telephone call to arrange for third-party inspection and DeSantis's execution of an appropriate affidavit, in an effort to avoid litigation. DeSantis did not respond. Compl. ¶ 47; Cros Dec. ¶ 43. Boston Centerless's Complaint and this motion follow.

## II.   ARGUMENT

### 1.  Applicable legal standards.

"The appropriateness of issuing a preliminary injunction turns on four factors: (1) the movant's probability of success on the merits, (2) the likelihood of irreparable harm absent preliminary injunctive relief, (3) a comparison between the harm to the movant if no injunction issues and the harm to the objectors if one does issue, and (4) how the granting or denial of an injunction will interact with the public interest." *Optos, Inc. v. Topcon Med. Sys., Inc*., 777 F. Supp. 2d 217, 238 (D. Mass. 2011) (granting injunction against use or dissemination of plaintiff's customer list trade secret information), *citing New Comm Wireless Servs., Inc. v. SprintCom, Inc*., 287 F.3d 1, 8–9 (1st Cir. 2002). "Out of these factors, the likelihood of success on the merits 'normally weighs heaviest in the decisional scales.'" *Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 386 F. Supp. 3d 89, 93 (D. Mass. 2019), *quoting Coquico, Inc. v. Rodriguez-Miranda*,

562 F.3d 62, 66 (1st Cir. 2009). "The Court may accept as true well-pleaded allegations in the complaint and uncontroverted affidavits." *Allscripts Healthcare*, 386 F. Supp. 3d at 93 (internal quotation omitted).

Because Boston Centerless is likely to succeed on all of its claims against DeSantis, because it faces irreparable harm from disclosure of its trade secrets, and because the balance of harms and the public interest favor an injunction, the Court should enjoin DeSantis from further use or disclosure of Boston Centerless's trade secrets.

### 2.  Boston Centerless is likely to succeed on its trade secret claims.

Boston Centerless asserts claims against DeSantis for misappropriation of trade secrets under both federal and state law. It is likely to succeed on these claims and is therefore entitled to an injunction. *See Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 125 (D. Mass. 2011) ("The *sine qua non* of this four-part inquiry is likelihood of success on the merits") (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). Indeed, both the federal Defend Trade Secrets Act ("DTSA") and the Massachusetts Uniform Trade Secrets Act ("MUTSA") expressly authorize injunctive relief for either actual or threatened misappropriation. 18 U.S.C. § 1836(b)(3)(A)(i); G.L. c. 93, § 42A(a).

### a.  DeSantis misappropriated Boston Centerless's trade secrets in violation of DTSA and MUTSA.

"The DTSA and MUTSA are nearly equivalent." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2021 WL 2982866, at *12 (D. Mass. July 15, 2021).[2] "To establish a claim for misappropriation of trade secrets under either statute, a plaintiff must show that: (1) the

---

[2] In 2018, Massachusetts became the forty-ninth state to enact the Uniform Trade Secrets Act. *See* M.G.L. c. 93, §§ 42A-42F. Because of the similarity between MUTSA and Massachusetts' predecessor statute, courts frequently apply pre-MUTSA precedent to claims brought under MUTSA. *See, e.g., KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2021 WL 6275214, at *7 (D. Mass. Aug. 23, 2021).

information at issue qualifies as a trade secret, (2) it took reasonable steps to preserve the secrecy of the information, and (3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Id*. Each of these elements is readily satisfied.

(i)  *The customer and sales information DeSantis stole are trade secrets*.

The extensive, proprietary compilation of customer and sales information—including, without limitation, pricing, historical and forecasted sales, ranking by sales volume, and customer needs and preferences—are plainly trade secrets under federal and state law. Both MUTSA and DTSA define trade secret similarly. In essence, "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *KPM Analytics*, 2021 WL 2982866 at *13.

"Customer lists are expressly recognized as being a type of compilation of information that can qualify as a trade secret." *Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *21 (D. Mass. Sept. 30, 2019). This is particularly true where customer lists contain pricing and sales history information. *See, e.g., FrontRunner HC, Inc. v. Waveland RCM, LLC*, 2020 WL 7321161, at *9 (D. Mass. Dec. 11, 2020) (customer list containing "key details on pricing, past volumes of business, past business needs, and contact information" was a trade secret under DTSA and MUTSA); *CPI Card Grp.--Colorado, Inc. v. Lehouck*, 2014 WL 5025356, at *6 (D. Mass. Oct. 8, 2014) ("the identities and contact information of [plaintiff]'s customers, … their strategies, buying preferences, pricing requirements, technical specifications and long-term plans" constitute trade secrets under Colorado Uniform Trade Secrets Act); *Aggreko, LLC v. Koronis*, 2013 WL 6835165, at *4 (D. Mass. Dec. 19, 2013) (customer information including "pricing and discount information,

[and] equipment needs" constitute trade secrets). Indeed, MUTSA specifically enumerates "customer list" in the definition of "trade secret." G.L. c. 93, § 42(4).

The confidential information misappropriated by DeSantis fits squarely within these parameters. It includes customer order histories, preferences, particular needs, and pricing and terms of service offered to such customers; detailed product pricing and margin information for key Boston Centerless customers, including cost of product inventory and pricing; order timing and quantities for customers; and information about historical sales to Boston Centerless customers in past years, the present year, and projected future sales to such customers reflecting anticipated customer needs and sales volume. Compl. ¶ 35; Cros Dec. ¶ 25.

> (ii) *Boston Centerless took reasonable steps to preserve the secrecy of its trade secrets.*

Boston Centerless has taken all reasonable measures to protect the secrecy of its trade secrets and confidential information. Compl. ¶ 43; Cros Dec. ¶¶ 34-37. "To determine whether a party has taken reasonable steps to preserve the secrecy of claimed trade secrets, the Court considers several relevant factors: (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed to any employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered readily ascertainable by the third parties." *FrontRunner HC, Inc. v. Waveland RCM, LLC*, 2020 WL 7321161, at *10 (D. Mass. Dec. 11, 2020), *citing USM Corp. v. Marson Fastener Corp*., 379 Mass. 90, 98 (1979).

"The standard is one of reasonableness, not perfection, and a company is not required to take heroic steps to preserve the secrecy of its trade secrets." *Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *23 (D. Mass. Sept. 30, 2019) (internal quotation omitted) (plaintiff sufficiently protected trade secrets by requiring defendants to sign confidentiality agreements and using electronic records portal to maintain customer information, access to which was revoked by defendants were terminated); *see also FrontRunner*, 2020 WL 7321161, at *11 (limiting access to information based on employee's job title and function, having employees sign NDAs, and retaining information security service were sufficient to show reasonable protection).

Boston Centerless took reasonable steps to protect its trade secrets. *First*, it required employees, including DeSantis, to sign confidentiality agreements and to agree to adhere to policies expressly requiring protection of—and, upon termination, return of—confidential and trade secret information. Compl. ¶ 43; Cros Dec. ¶ 36. *Second*, it limited distribution of its sensitive customer trade secret information to only about 15 executives and sales managers, who needed the information for their jobs. Compl. ¶ 32; Cros Dec. ¶¶ 21-22, 34. *Third*, Boston Centerless provides its employees with orientation regarding its policies, distributes the Handbook containing policies governing the protection of confidential information and trade secrets, and requires employees to acknowledge receipt and their agreement to follow such policies. Compl. ¶ 43, Ex. B; Cros Dec. ¶¶ 35-37.

        (iii) *DeSantis misappropriated Boston Centerless's trade secrets in breach of a confidential relationship and used improper means to acquire them*.

DTSA defines misappropriation as "the disclosure or use if a trade secret of another without express or implied consent by a person who ... at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C.

§ 1839(5)(B). Similarly, MUTSA defines misappropriation in relevant part as disclosure or use of a trade secret without consent, by a person who acquired the trade secret under circumstances giving rise to a duty to limit its disclosure or use, or who used improper means to acquire it. G.L. c. 93, § 42(2).

DeSantis has plainly taken Boston Centerless's trade secrets by improper means, having emailed them to his personal account on the day of his termination, despite being contractually obligated to use them only for purposes of his job at Boston Centerless and to return them upon leaving the company. Compl. ¶¶ 23-30, 34-35; Compl. Ex. A at 1-2; Cros Dec. ¶¶ 15, 24-25. *See also* G.L. c. 93, § 42(1) (defining "improper means" as, without limitation, a "breach of a confidential relationship or other duty to limit … disclosure or use of information"). "As a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means." *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 241 (D. Mass. 2011); *see also Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *24 (D. Mass. Sept. 30, 2019) (defendants' "retention of [trade secret] information and its use after the termination of their [sales consulting] Agreements was in violation of their contractual duties and was therefore improper"); *FrontRunner*, 2020 WL 7321161, at *11 (forwarding customer information to defendants' personal email accounts and otherwise accessing and transferring such information on day of resignation in breach of non-disclosure obligations constitutes improper means). Indeed, if DeSantis did not himself recognize that his emailing of Boston Centerless's trade secrets to himself was improper, he would not have denied doing so, even in the face of indisputable evidence to the contrary. *See* Compl. ¶¶ 47-48; Compl. Ex. D.

### b.  The other requirements for a trade secret claim are met.

*First*, Boston Centerless derives actual economic value from its trade secrets not being generally known or readily ascertainable. *See* 18 U.S.C. § 1839(3)(b); G.L. c. 93, § 42(4)(i). For customer information including order history, pricing history, margin information, and projected future sales, "there can be little question that the information would be of value to competitors, since competitors would have the information necessary to undercut [plaintiff], including contact information, information about the [purchasing] needs of the customer, and the price the customer was paying." *Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *23 (D. Mass. Sept. 30, 2019); *see also Ooyala, Inc. v. Dominguez*, 2018 WL 3360759, at *6 (D. Mass. July 10, 2018) (trade secret protection appropriate for "internal communications discussing client needs" because that information "would certainly provide any competitor with a meaningful business advantage by enabling it to pilfer business opportunities while avoiding business development costs").

Here too, the confidential customer and sales information DeSantis stole clearly derives independent economic value from not being generally known or readily ascertainable by others. Knowledge of this information could enable a competitor to identify sales prospects, beat Boston Centerless's pricing, and divert business from Boston Centerless. Moreover, this information could provide competitors with an unfair, unearned advantage by enabling effective allocation of resources and marketing efforts to the listed customers based on the details about their specific needs and preferences, which Boston Centerless compiled. Furthermore, this information could enable a competitor to prioritize or target its marketing to certain of these customers based on the detailed historical and projected future sales information Boston Centerless compiled in these files, including customer ranking by sales volume. Compl. ¶¶ 38-39; Cros Dec. ¶¶ 28-31.

*Second*, Boston Centerless put significant effort and expense into developing the trade secrets that DeSantis misappropriated. It acquired and compiled this information through years of cultivating relationships and doing business with its customers and materials suppliers. Boston Centerless employs business development personnel who track and compile information concerning customer purchase and service histories, customer needs and preferences, technical data and specifications for parts ordered and/or needed, sales volume, pricing offered to customers, sales strategies, among other such information, and has provided such employees with considerable resources necessary to develop this information and the underlying relationships necessary to obtain it. Compl. ¶¶ 36, 40; Cros Dec. ¶¶ 27, 32.

*Third*, DTSA's requirement that the trade secret be "used in, or intended for use in, interstate or foreign commerce" is satisfied. *See* 18 U.S.C. § 1836(b)(1). Boston Centerless uses its trade secrets to market and sell its products across all 50 states. Compl. ¶ 19; *see also ARK Nat'l Holdings LLC v. We Campaign LLC*, 2021 WL 5918682, at *5 (D. Mass. Dec. 15, 2021) (use of trade secrets in developing "interstate marketing strategy" satisfied interstate commerce requirement).

### 3.  Boston Centerless is likely to succeed on its Ch. 93A claim.

Section 11 of Massachusetts' unfair trade practices act provides a cause of action for businesses against unfair or deceptive trade practices. M.G.L. c. 93A, § 11. "Under Massachusetts law, misappropriation of trade secrets alone can constitute a violation of Chapter 93A." *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc*., 412 F.3d 215, 243 (1st Cir. 2005), citing *Jillian's Billiard Club of Am., Inc. v. Beloff Billiards, Inc*., 35 Mass. App. Ct. 372, 619 N.E.2d 635 (Mass. App. Ct. 1993). Though Section 11 does not apply to purely intra-enterprise disputes, "[w]here an employee misappropriates his or her employer's proprietary materials during the course of employment and then uses the purloined materials in the marketplace, that conduct

is not purely an internal matter; rather, it comprises a marketplace transaction that may give rise to a claim under G. L. c. 93A, § 11." *Governo L. Firm LLC v. Bergeron*, 166 N.E.3d 416, 424-25 (Mass. 2021).[3]

As discussed above, Boston Centerless is likely to prevail on its trade secret claims. Because its trade secrets merit protection, and because DeSantis plainly misappropriated them and has threatened to provide them to a competitor, Boston Centerless is also likely to succeed on its Chapter 93A claim, supporting issuance of an injunction. Furthermore, Section 11 of Chapter 93A expressly provides for injunctive relief even *before* plaintiff has suffered any loss, where the unfair act or practice "*may* have the effect of causing such loss of money or property." (Emphasis added.)

### 4. Boston Centerless is likely to succeed on its contract and conversion claims.

Because Boston Centerless is also likely to succeed on its common law claims, these claims also provide the basis for an injunction. A breach of contract claim requires 1) the existence of a valid and binding contract, 2) breach of the terms of the contract by defendant, and 3) damages from the breach. *See, e.g., Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 127–28 (D. Mass. 2011) (plaintiff likely to succeed on contract claim where defendant misappropriated trade secrets in breach of contract, justifying preliminary injunction). The Agreement's prohibition on disclosing Boston Centerless's trade secrets is facially valid. *See* Compl., Ex. A at 1-2; *see also Aspect Software*, 787 F. Supp. 2d at 128 (contractual provision "explicitly was drafted to protect [plaintiff]'s trade secrets, which is a goal consistent with the public interest").[4] DeSantis plainly

---

[3] In *Governo*, the SJC found that plaintiffs were entitled to a new trial on their Chapter 93A claim to the extent it was based on defendants' copying and taking of plaintiff's proprietary materials while defendants were plaintiff's employees, which the jury instructions erroneously precluded from consideration. *Id*. at 422-23.

[4] Though the Court's analysis of the enforceability of the non-compete clause at issue in *Aspect Software* may not reflect subsequent changes to Massachusetts statute, the breach of contract analysis for evaluating whether to issue a preliminary injunction remains sound.

15424735.1

breached the contract by misappropriating Boston Centerless's trade secrets on his last day at the company. Compl. ¶¶ 34-35; Cros Dec. ¶¶ 24-25. If DeSantis is not enjoined from disclosing and using Boston Centerless's trade secrets, the company will suffer serious competitive harm, particularly in light of DeSantis' announced intention to use the misappropriated trade secrets for the benefit of a competitor. Compl. ¶¶ 39, 41, 62, 73, 80; Cros Dec. ¶¶ 29-31. DeSantis has plainly breached the Agreement and Boston Centerless is likely to succeed on its contract claim.

A conversion claim requires that (1) the defendant intentionally and wrongfully exercised control or dominion over personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused. *See, e.g., Unum Grp. v. Loftus*, 220 F. Supp. 3d 143, 148 (D. Mass. 2016) (conversion claim supported preliminary injunction against former employee seen on surveillance videos removing plaintiff's property). By emailing himself Boston Centerless's trade secrets on his last day at the company, in violation of the Agreement, and subsequently refusing to return or destroy the information upon Boston Centerless's demand, DeSantis converted Boston Centerless's property.

### 5.   Boston Centerless will suffer irreparable harm without an injunction.

"A threat of future harm is presumed when a plaintiff successfully demonstrates a likelihood of success on the merits of a claim for trade secret misappropriation." *Ooyala, Inc. v. Dominguez*, 2018 WL 3360759, at *7 (D. Mass. July 10, 2018), *citing TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 32 (D. Mass. 2004) (recognizing that, "once the trade secret is lost, it is gone forever"). Disclosure of the trade secrets misappropriated by DeSantis would cause irreparable harm to Boston Centerless because these trade secrets were developed through years of hard work, effort, and expenditure of resources, which would be squandered

permanently if brought to a competitor, as DeSantis has threatened. Compl. ¶¶ 39-41, 62, 73, 80; Cros Dec. ¶¶ 27, 29-33.

### 6.  The balance of harms weighs heavily in favor of granting an injunction.

"The potential harm to [Boston Centerless] from denying the injunction is significant," and DeSantis cannot "advance[ ] any persuasive argument that [he] would be subject to any burden beyond that required to prevent the further use of [Boston Centerless's] confidential information." *Ooyala, Inc. v. Dominguez*, 2018 WL 3360759, at *7 (D. Mass. July 10, 2018); *see also TouchPoint Sols., Inc. v. Eastman Kodak Co*., 345 F. Supp. 2d 23, 32 (D. Mass. 2004) (defendant "will not incur any harm from" restriction on sharing plaintiff's "trade secret information with third parties"). Indeed, the requested injunction places a minimal burden on DeSantis—return to the status quo that existing before he misappropriated, with third-party verification that all confidential materials and trade secrets have been returned or destroyed—compared with the significant harm facing Boston Centerless if DeSantis follows through on his threat to provide Boston Centerless's trade secrets to a competitor.

### 7.  The public interest favors an injunction against DeSantis.

"Massachusetts clearly favors strong protection for trade secret information." *Ooyala, Inc. v. Dominguez*, 2018 WL 3360759, at *7 (D. Mass. July 10, 2018) (granting preliminary injunction against further use or disclosure of plaintiff's trade secrets); *see also Jet Spray Cooler, Inc. v. Crampton*, 385 N.E.2d 1349, 1354–55 (Mass. 1979) ("The protection which we afford to trade secrets against one who wrongfully uses them is grounded on principles of public policy to which we have adhered since [1868]"). Given that Boston Centerless seeks to enjoin only DeSantis's use and disclosure of its trade secrets that DeSantis misappropriated on his last day of work, the public interest strongly favors an injunction.

## III.   CONCLUSION

For the above reasons, Plaintiff Boston Centerless, Inc. respectfully requests that this Court enter an Order:

A.      Preliminarily enjoining Defendant from using and/or disclosing to any other person or entity any of Plaintiff's confidential information and/or trade secrets;

B.      Preliminarily enjoining Defendant to return to Plaintiff any originals, copies, facsimiles, or duplicates of any documents, tangible things, or materials of any kind containing Defendant's confidential information and/or trade secrets;

C.      Preliminarily enjoining Defendant to permit third-party forensic imaging of Defendant's computers, laptops, mobile devices, tablets, email accounts, cloud storage, external hard drives, thumb drives, and/or any other electronic information or data storage devices to search for Plaintiff's confidential information and/or trade secrets;

D.      Preliminarily enjoining Defendant to destroy all electronically stored information, data, files, and/or materials of any kind containing Plaintiff's confidential information and/or trade secrets, including any copies thereof, in Defendant's possession, custody, or control; and

E.      Granting such other and further relief as justice may require.

Dated: October 11, 2022                        Respectfully submitted,

                                               /s/ Mark B. Rosen
                                               Mark B. Rosen (BBO # 669619)
                                               Kyle M. Noonan (BBO # 705713)
                                               PIERCE ATWOOD LLP
                                               100 Summer Street, 22nd Floor
                                               Boston, Massachusetts 02110
                                               Tel.: (617) 488-8100
                                               Fax: (617) 824-2020
                                               mrosen@pierceatwood.com
                                               knoonan@pierceatwood.com

                                               *Attorneys for Plaintiff Boston Centerless, Inc.*

15424735.1

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 11, 2022, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing (NEF). Any party not receiving NEF will be served pursuant to the Federal Rules of Civil Procedure. A copy of the foregoing will also be sent by email and overnight mail to Defendant Mark A. DeSantis at the following address:

Mark A. DeSantis
1494 Polo Drive
Bartlett, IL 60103
Mark.desantis@yahoo.com

/s/ Mark B. Rosen
Mark B. Rosen (BBO # 669619)

15424735.1